IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


VERNON W. COURTNEY,                     :

          Plaintiff            :      Civil Action 2:08-cv-807

   v.                                       :      Judge Holschuh

COMMISSIONER OF SOCIAL          :      Magistrate Judge Abel
SECURITY,
                               :
          Defendant


## REPORT AND RECOMMENDATION


Plaintiff Vernon W. Courtney brings this action under 42 U.S.C. §405(g) for review of a final decision of the Commissioner of Social Security denying his application for a period of disability and disability insurance benefits and for supplemental security income. The matter is before the Magistrate Judge for a report and recommendation on the disposition of this matter.


<u>Summary of Issues</u>.

Plaintiff Vernon W. Courtney filed an application for a period of disability and disability insurance benefits and for supplemental security income in October 2003, alleging that he had been disabled since April 13, 2002, at age 42, by several impairments including backache, blackout spells, and mental problems in

1

concentrating on work and interacting with others.  The administrative law judge concluded that Courtney's mental impairments, aside from borderline intellectual functioning, did not significantly impair his ability to do work.  He also concluded that Courtney could occasionally lift 20 pounds and frequently lift 10 pounds, that he had no impairment to his ability to sit, stand, or walk, that Courtney should not work at heights or operate machinery owing to blackout spells, and that Courtney's ability to move his neck was limited.

Plaintiff argues that the ALJ failed to address one physician's mental residual functional capacity assessment, which presented Courtney as significantly more limited in his abilities, that he improperly deferred to the medical expert's physical residual functional capacity assessment rather than making his own findings, and that his hypothetical questions to the testifying vocational expert were improper because he deferred to the medical expert's testimony instead of stating his own hypothetical capacity assessment.

**Procedural History**.  Plaintiff Vernon W. Courtney filed his application for a period of disability and disability insurance benefits and for supplemental security income (SSI) on October 28, 2003.[1]  (R. 18.)  He claimed that he had become disabled on April 13, 2002, by poor vision, headaches, backache, blackout spells,

---

[1]  Courtney previously applied in 2000 for a period of disability and disability insurance benefits.  This application was finally denied by the Appeals Council on April 12, 2002.  (R. 18.)  Courtney's present application alleges disability from the day following the decision of the Appeals Council on his prior application.

muscular problems in his arms and hands, difficulty sleeping, poor appetite, and mental problems in concentration and interacting with others. (R. 336.) The application was denied initially and upon reconsideration. Plaintiff sought a hearing before an administrative law judge. On July 27, 2006, Administrative Law Judge Jeffrey A. Griesheimer (the "ALJ") held a hearing, at which Plaintiff, represented by counsel, appeared and testified. On January 17, 2007, the ALJ issued a decision finding that Courtney had not been under a disability since the date of application. (R. 42.) On June 18, 2008, the Appeals Council denied Plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security. (R. 10.) On August 21, 2008, Courtney filed this action.

**Age, Education, and Work Experience**. Courtney was born on April 14, 1960. He graduated from high school in 1978, and completed one year of college. (R. 1030-1031.) He received some vocational training in home energy efficiency improvement. (R. 1031.) The claimant worked for a home winterizing company for several years, and before that as a security guard, taxicab driver, cook, and laundromat maintenance worker. (R. 1032-1038.) He last worked in September 1999. (R. 139.)

**Plaintiff's Testimony**. The administrative law judge fairly summarized Moore's testimony at the hearing as follows:

On July 27, 2006, in response to my questions, the claimant testified as follows concerning his impairments. He had experienced breathing difficulties since his lung collapsed in 2002. He used inhalers. He didn't sleep much at night because of breathing difficulties and had to use three pillows. He had started to experience heart problems a couple of years ago, which became really bad in 2005. He experienced a squeezing tightness in his chest. He had undergone surgery on his cervical spine and needed more surgery at C2-3, but had refused the additional surgery. He had pain and limitation of motion in his neck that extended down his back. Sometimes his hands curled up. He had undergone two operations on his brain. He had pain in his left knee. On a scale in which 10 represents the highest possible degree of pain, the claimant's pain usually rated a 6 or 7. At the hearing, it was a 7. His pain was worse with bending and sitting. He had some problems hearing. In response to questions from his attorney, the claimant testified that he had pain in his neck, upper back, and lower back, as well as pain between his shoulders. His pain was like a sharp needle stabbing him. He was never pain free, although sometimes his pain was better than other times. Bending made his pain worse. Lifting and carrying hurt his shoulders. In response to questions from the medical expert, the claimant testified that he had episodes of dizziness and had fainted on occasion during these spells. He had fallen off a ladder because of these episodes. After these spells, he experienced very bad headaches.

He alleged that he could walk for only one block at a time and stand for only 30 minutes at a time, for a total of less than one hour during an eight-hour workday. He could sit for 20 to 30 minutes at a time, for a total of three hours during an eight-hour workday. He could bend two times an hour. He could reach in front of him from his knees to his shoulders all right, but could not reach overhead well. He could seldom climb stairs. He could lift and carry a gallon of milk. He could push a grocery cart that was one-half full, but it was painful for him to do it. He could manipulate all right using his arms and fingers, but his hands became swollen occasionally.

(R. 21.)

## Medical Evidence of Record.

Although the administrative law judge's decision fairly sets forth the relevant

medical evidence of record, this Report and Recommendation will summarize that

evidence in some detail.

**Physical Impairments**.

Robert A. Dixon, D.O.  Dr. Dixon, a neurosurgeon, performed an evaluation of Courtney on August 28, 1996.  Courtney complained of acute onset of neck pain since an automobile accident in 1990.  He had enjoyed some relief through chiropractic treatment until recent months, when his pain had begun to spread into his left arm and hand.  Dr. Dixon diagnosed Courtney with C7 radiculopathy in his left upper extremity due to herniated cervical disk C6-7 on the left, and cervical spinal cord injury, mild, with Hoffman's sign present on the left, which he suspected was due to C6-7 disk herniation.  (R. 206.)  Dr. Dixon subsequently performed an interbody fusion at C6-7 on the left, and nerve root decompression.  (R. 372.)  In correspondence of February 3, 1997, Dr. Dixon stated that Courtney's headaches, arm pain, and neck pain had essentially been resolved.  (R. 372.)

On October 26, 1999, Courtney underwent an MRI of the cervical spine.  He had been complaining of pain in his neck and arms, and that his hands had been "drawing up", since his 1997 cervical surgery.  The MRI demonstrated 1-2 mm of anterior subluxation of C2 with respect to C3, very minimal posterior bulging of the disc at the C3-C4 level, no evidence of focal disc herniation or neural distortion at the C4-C5 level, a small posterior herniation of disc towards the left side with effacement and posterior displacement of the posterior longitudinal ligament without neural distortion at the C5-C6 level, and a moderate sized herniation of soft tissue material protruding posteriorly toward the left side which enhanced with

5

contrast at the C6-C7 level, which could represent fibrosis and which appeared to be causing some neural distortion on the left side. There appeared to be mild acquired spinal stenosis at the C5-C6 and C6-C7 levels. (R. 211-212.)

In correspondence of November 3, 1999 to Courtney's chiropractor, Dr. Schrickel, Dr. Dixon reported that Courtney had in the past several weeks developed increasing headaches, pain in his left arm, left chest, left abdomen, and left leg. He stated that he had interpreted the October 26, 1999 MRI to demonstrate left hemialgia, status post his 1990 automobile accident, and left upper extremity weakness, pain, numbness, and tingling, possibly contributed due to cervical disk disease at C5-C6. (R. 202.) Dr. Dixon found it unlikely that postoperative changes had caused such a dramatic change in the two and a half years since surgery. He recommended a course of manipulative therapy and office physiotherapy in hopes of improving Courtney's symptoms. (R. 202.)

In correspondence of January 5, 2000 to Dr. Schrickel, Dr. Dixon stated that Courtney had recently completed a cervical myelogram study, which had showed solid fusion and no evidence of nerve root impingement at C6-7 in the area of previous surgery. It had, however, showed a herniation at C5-6. He noted that Courtney's wife had reported that he would break into a sweat if he stood up suddenly, and that his left arm, leg, face, and trunk would go numb. Courtney also reported headaches and tremors. Dr. Dixon recommended that Courtney follow up with a neurologist for these symptoms. (R. 198.)

In correspondence of February 11, 2002 to Dr. Schrickel, Dr. Dixon stated

that Courtney had come in that day for a re-evaluation. He complained of severe neck pain in the cervicothoracic junction, facial numbness, blackout spells, and pain in his left shoulder with shoulder motion. (R. 374.) He stated that he had been unable to return to work. Dr. Dixon examined him, and found left shoulder pain consistent with internal derangement of the left shoulder, and myofascial syndrome in his cervical spine. (R. 375.) He recommended that Courtney undergo either an MRI study of his neck or an Isotopic bone scan, as well as an orthopedic evaluation of his left shoulder. Dr. Dixon also advised that Courtney proceed with manipulative therapy, if Dr. Schrickel thought it advisable. (R. 375.)

Coshocton County Memorial Hospital, 2004. On January 25, 2004, Courtney went to the emergency room, complaining of sudden crushing pain in his left parasternal chest, diaphoresis, and shortness of breath. (R. 398.) He stated that the pain went up into his shoulder and into his back, and that it was exacerbated by deep breathing. He reported at the time that he had previously been diagnosed with brain tumors, though he was unable to offer specific details. Courtney was admitted to the hospital, and given a chest x-ray and a cardiac battery diagnostic. (R. 399.) After the chest x-ray was taken, Courtney was diagnosed with tension pneumothorax, with a collapsed left lung, and had a chest tube inserted. (R. 400.) His lung was successfully re-inflated, and his condition improved. (R. 401.) However, on the morning of January 29, another chest x-ray revealed that his pneumothorax was growing worse. Courtney was therefore transferred to Aultman Hospital in Canton. (R. 404.)

7

Aultman Hospital.  Courtney was transferred to the hospital on January 30, 2004.  (R. 439.)  His chest tube was removed, and a subsequent x-ray showed a small residual left apical pneumothorax, which was eventually resolved.  During his stay in the hospital, a CT scan was performed, which revealed a benign pineal cyst.  Courtney was additionally diagnosed with hyperlipidemia.  (R. 439.)  He was discharged from the hospital on February 3, 2004.  The treating physician noted that Courtney had a history of syncope, but that he was not actively exhibiting symptoms at the time.  (R. 439.)

On February 12, 2004, Dr. Eli Rubenstein, M.D. conducted a follow-up chest examination on Courtney, which was normal.  Dr. Rubenstein found no evidence of pneumothorax.  (R. 452.)

On February 14, 2005, Dr. William Wallis, M.D. conducted another follow-up chest examination on Courtney, which was normal.  Dr. Wallis found no evidence of pneumothorax.  (R. 476.)

Coshocton Memorial Hospital, 2005.  On March 15, 2005, Dr. John D. Dunbar, M.D. conducted a bilateral carotid duplex ultrasound and echocardiogram on Courtney to address his reports of syncope and collapses.  (R. 477-478.)  The echocardiogram was normal.  (R. 479.)  However, the ultrasound found moderately advanced stenosing plaque disease in his right bulb and ICA.  (R. 477.)

On April 6, 2005, Courtney went to the emergency room, complaining of severe tightening pain in his mid chest.  (R. 491.)  He was treated with Lovenox and nitro paste, which alleviated his symptoms.  He was then admitted to the intensive

care unit for further observation and management. Courtney denied any nausea, vomiting, seizure, or loss of consciousness. He did state that he had a history of cough and shortness of breath. (R. 491.) Courtney was placed on medication for his chest pain and to treat his hyperlipidemia. (R. 492.) He was diagnosed with coronary artery disease with chest pain, with secondary diagnoses of chronic obstructive pulmonary disease, chronic smoking, hyperlipidemia, 40% narrowing of his carotid, and gastroesophageal reflux disease. (R. 493.) Courtney was evaluated to be "reasonably doing well" on April 8, 2005, and was discharged on that date; his condition was discussed with Dr. Jerry Moore, a cardiologist in Zanesville, with whom Courtney was to perform outpatient follow-up. (R. 494.)

On April 15, 2005, Courtney developed a crushing sensation in his chest, and consulted Dr. Jerry Moore. Dr. Moore admitted him to the hospital. (R. 524.) On April 18, 2005, Courtney underwent cardiac catheterization; at the time, he was found to have 40% left main, 90% proximal LAD, 90% proximal circumflex and multiple 90-99% lesions in his right coronary. On April 20, 2005, he underwent a triple bypass with left internal mammary to LAD, saphenous vein to obtuse marginal, saphenous vein to obtuse marginal, and saphenous vein to posterior descending. (R. 524.) He tolerated the surgery well. On April 22, 2005, his chest tube was removed. A post removal examination revealed persistent left basilar lung density. (R. 642.) On his third postoperative day, Courtney fell and struck his head. However, no neurological changes were exhibited, and a CT of his head revealed no abnormalities. (R. 524.) On April 24, 2005, he was "up and around",

and was discharged home.

On May 12, 2005, Courtney went for a post surgical follow-up to Gregory S. Keagy, D.O. Dr. Keagy noted that Courtney was on aspirin 81 mg/day, Zocor 40 mg/day, Lopressor 25 mg/day, albuterol inhaler, amiodarone 200 mg. Courtney's heart was regular without murmurs or rubs, and his abdomen was soft and non-tender. He reported that he was getting around without difficulty, and Dr. Keagy encouraged him to enroll in outpatient rehabilitation and to refrain from driving for at least another week. Dr. Keagy also asked Courtney to refrain from any lifting for at least three to four more weeks. (R. 791.)

On May 14, 2005, Courtney visited the emergency room, complaining of redness and swelling in the site of his left graft harvesting site. He stated that it was a little hardened and painful. He was diagnosed with cellulitis in his left leg, prescribed antibiotics, and advised to follow up with his physician in two days. (R. 803.)

On May 17, 2005, Courtney returned to the emergency room, stating that he had followed up on his leg with his physician, who had informed him that he had phlebitis and ordered him to the emergency room. He complained of pain and swelling of the left thigh and leg, and swelling in his left foot. (R. 808, 811.) Courtney was admitted to the hospital, and placed on antibiotics. (R. 812.) On May 18, 2005, he received an ultrasound examination of his left leg, which found a normal deep venous system in the left lower extremity, and no change in what might been a liquified hematoma or seroma in the posteromedial distal thigh. (R.

817.)  On May 19, 2005, he received an MRI on his left knee.  This found a fusiform subcutaneous abnormality in his posteromedial thigh slightly above the femoral condyles.  The signal characteristics, location, and shape of this abnormality were consistent with a well incapsulated hematoma or seroma.  There was also a possibility of a small amount of inflammation of the adjacent subcutaneous fat, and there was fluid in Courtney's suprapatellar bursa and joint space, although its cause was unknown.  (R. 818.)  On May 20, 2005, Courtney was prescribed medications and discharged home, having "improved significantly".  (R. 821.)

On April 11, 2006, Courtney visited the hospital again, complaining of progressive swelling of the volar aspect of his hands, especially the right hand.  (R. 857.)  He denied any paresthesias in his hands, trauma to his hands, dyspnea on exertion, paroxysmal noctural dyspnea, or orthopnea.  Courtney exhibited no congestive heart failure symptoms.  He was given a chest x-ray, which ruled out the possibility of obstruction due to lung mass and which demonstrated no evidence for acute pulmonary process.  (R. 856, 858.)  He was diagnosed with cellulitis in the hands, and discharged home with a prescription for Keflex.

Raymond J. Votypka, M.D.  On March 27, 2006, Courtney went to see Dr. Votypka on referral from Dr. Hamza, complaining of a headache and earache in the right ear.  Dr. Votypka found, on physical examination, that Courtney's left ear and eardrum were normal, and that his right eardrum was sclerotic.  He diagnosed Courtney with otalgia in his right ear post two mastoid surgeries, and temporomandibular joint dysfunction.  (R. 849.)  Dr. Votypka ordered diagnostic

audiometry. This was conducted on March 28, 2006; it found that Courtney had moderate to severe hearing loss in his right ear, and that he was a candidate for a hearing aid in his right ear. (R. 847.)

On May 8, 2006, Courtney visited Dr. Votypka for a follow-up. Dr. Votypka reviewed the audiometry, and prescribed him a hearing aid. He noted that Courtney "is having trouble getting Social Security Disability", and told Courtney and his wife "that I will help fill out forms to certify him from Social Security Disability". (R. 845.)

Philip B. Schrickel, D.C.  Dr. Schrickel, a chiropractor, treated Courtney between 1995 and at least November 2003. (R. 379-380.) Courtney underwent treatment for neck, mid and lower back pain, associated with headaches and bilateral hand/arm numbness. In a November 21, 2003 letter to a state disability determination agency, Dr. Schrickel opined:

> Overall, I feel that Mr. Courtney is totally disabled from any gainful substantial employment. His back and neck pain along with his physical limitations would make it very difficult for him to find a job in a laboring capacity, and his educational limitations would make it very difficult for him to find a job in an office-type setting.

(R. 380.)[2]

On January 24, 2003, Dr. Schrickel prepared an x-ray report, which found in cervical views no evidence of recent fracture, dislocation, or other osseous

---

[2]  The ALJ in the present case rejected Dr. Schrickel's opinion because the record as a whole did not support it. (R. 38.) The ALJ in Courtney's 2000 disability application rejected Dr. Schrickel's opinion because he is a chiropractor and not an accepted medical source. (R. 67.)

pathology. Courtney's bone density was good, and the soft tissues were within normal limits. His prior surgical fixation at the C6/C7 level was well maintained, and overall rangers of motion in hyperflexion and hyperextension were moderately restricted. Two lumbar views revealed similar findings; a mild dorsal/lumber dextro-scoliosis was suggested. (R. 378.)

Mohamed Hamza, M.D. On June 14, 2006, Dr. Hamza, who had treated Courtney at Coshocton Memorial Hospital, completed a form residual functional capacity questionnaire. He opined that Courtney could sit or stand for no more than 15 minutes at a time, could not walk any city blocks, could sit, stand, and walk for less than two hours in a normal workday. He stated also that Courtney would probably need to lie down every three hours for a rest of about a half hour in duration. Courtney could occasionally lift ten pounds, could not stoop or crouch, and was likely to have good days and bad days. Dr. Hamza opined that Courtney was likely to be absent from work more than four times per month. He also stated that Courtney required the use of a cane, and had done so since 1992. (R. 863-865.)

Raj Trapathi, M.D. On February 22, 2000, Dr. Trapathi evaluated Courtney at the request of a state disability determination agency. (R. 224.) Courtney complained of occasional headache and chest pain, and of dizziness when making sudden motions. (R. 224.) He also complained of persistent pain over the paraspinal in the cervical area, and in the lower thoracolumbar area, aggravated by prolonged physical activity. (R. 225.) Dr. Tripathi assessed him to have chronic bronchitis, status post mastoid surgery, and status post cervical surgery with

13

chronic back pain. He opined that Courtney could sit for four to six hours, stand for three to four hours, walk for approximately four to six hours, lift approximately 15 to 20 pounds, and carry 10 to 15 pounds. He stated that Courtney's abilities in handling objects, hearing, speaking, and traveling were not affected, that his memory appeared to be good, and that he should not have any problem with social interaction and adaptation. (R. 227.)

Robert J. Thompson, M.D. On December 8, 2003, Dr. Thompson conducted an examination of Courtney for a state disability determination agency. He stated that Courtney reported blackout spells and collapses about twice a month, and that he had undergone a cervical fusion at C5-6 in 1995 following a cervical fracture some years before. However, Courtney claimed that his symptoms had returned, and that the physician who had performed the surgery was now recommending that it be repeated. (R. 381.) Dr. Thompson found that Courtney had no motor weakness, muscle atrophy, or muscle fasciculations, that his ability to grasp and manipulate with either hand was normal, and that his range of motion of the cervical spine was significantly reduced in all directions. (R. 382.) He also found some decrease in range of motion of the left knee. (R. 382.) Dr. Thompson diagnosed Courtney with cervical disc herniation with previous fusion. (R. 383.) He found that Courtney would be unable to do any work that required repetitive heavy lifting, but that there was no objective impairment with sitting, standing, walking, occasional lifting, and handling objects, and that Courtney had no hearing or mental impairment. (R. 383.) Dr. Thompson noted that, because of Courtney's

14

blackout spells, he would not be able to drive or to work at heights.  (R. 383.)

Walter A. Holbrook, M.D.  On February 21, 2004, Dr. Holbrook, a state agency physician, completed a form physical residual functional capacity assessment.  He stated that Courtney could occasionally lift or carry fifty pounds, could frequently lift or carry ten pounds, could stand or walk for about six hours in an 8-hour workday, could sit for about six hours in an 8-hour workday, and had an unlimited ability to push or pull.  (R. 470.)  He found no postural, communicative or visual limitations, and that Courtney's ability to reach in all directions was limited. (R. 471-472.)  He also found that Courtney should avoid all exposure to hazards such as machinery or heights.  (R. 472.)  Dr. Thompson stated that Courtney's symptoms were attributable to a medically determinable impairment, that the severity and duration of his symptoms were not disproportionate to their expected severity or duration, and that Courtney's allegations as to his symptoms and their effect on his ability to function were partially credible.  (R. 473.)  He stated in conclusion: "The RFC given is an adoption of the ALJ RFC dated 2/13/02.  The RFC is being adopted under AR98-4 (Drummond Ruling)."  (R. 470.)

Gordon B. Snider, M.D.  Dr. Snider testified at Courtney's hearing as a medical expert.  (R. 1068-1069.)  He identified the following documented impairments:  coronary artery disease, status post coronary artery bypass grafting, chronic obstructive pulmonary disease from smoking, high blood pressure, pneumothorax, status post cervical fusion at the C6/7 level, spondylothesis at the C2/3 level, a herniated disc at the cervical 5/6 level, mastoid surgery, hearing loss, a

pineal cyst, vasovagal syncope, gastroesophageal reflux disease, a history of cellulitis post his coronary artery bypass surgery, and a full scale IQ of 78. (R. 1069-1070.) He stated that, in his opinion, none of Courtney's impairments individually or in combination met or equalled any listed impairment.

The ALJ asked Dr. Snider to offer an opinion as to Courtney's residual functional capacity. Dr. Snider opined that Courtney could not be around smoke or fumes due to respiratory problems, or work at heights or operate a motor vehicle due to syncope. (R. 1072.) Courtney could not have a job where hearing acuteness was required. He could not have a job which required a lot of flexion and extension of his neck because of his spinal impairments. His ability to lift would be governed by his coronary artery disease; he could lift 20 pounds occasionally or 10 pounds frequently. (R. 1072.) Dr. Snider found no limitations to sitting, standing, or walking. Courtney had no limitations to fine manipulation and grasping, could occasionally bend, stoop, or squat, but could not crawl. (R. 1073.) He could climb stairs occasionally, with a handrail, but would need to work in an air conditioned environment with clean air. (R. 1074.) In addition, he could not work in extremes of temperature or humidity. (R. 1077.)

Dr. Snider stated that his residual functional capacity opinion was relevant for the period from April 13, 2002 to March 31, 2005. (R. 1080.) Courtney's limitations from April 2002 until January 2004 were related only to his ability to move his head and hearing loss, however. (R. 1081.)

Upon questioning by Courtney's attorney, Dr. Snider opined that Dr.

16

Hamsa's residual functional capacity assessment of June 14, 2006 was unreasonable to the extent that it stated that Courtney would likely miss work more than four times per month. (R. 1078.)

### Mental Impairments.

Alan White, Ph.D. On February 24, 2000, Dr. White conducted a psychological evaluation of Courtney in conjunction with a prior application for benefits. Courtney complained of feelings of worthlessness or guilt, a loss of interest in things he used to enjoy, problems concentrating, trouble making day to day decisions, a high general frustration level, and trembling. (R. 232.) He denied suicidal or homicidal ideation. (R. 234.) Dr. White found Courtney's immediate memory to be impaired, but his long-term memory intact. (R. 235.) He evaluated Courtney as having a performance IQ of 79, and a full-scale IQ of 77. (R. 236.) Dr. White made no Axis I diagnosis, but found Courtney to have borderline intellectual functioning on Axis II. (R. 237.) With respect to vocational activities, he found that Courtney's ability to remember, sustain, concentrate and attend was mildly impaired, his ability to follow simple directions was not impaired, his ability to get along with others was not impaired, and his ability to respond to job-related stress was mildly impaired. (R. 238.)

Karen R. Stailey, Ph.D., and J. Williams, Ph.D. On April 29, 2000, Stailey and Williams, two state agency psychologists, performed a review of Courtney's records in conjunction with a prior application for benefits. They found that (for his

initial application) a residual functional capacity assessment was necessary, and that Courtney suffered from mental retardation and autism. (R. 247.) In a functional capacity assessment, they opined that Courtney either was not significantly limited, or there was no evidence of limitation, in any vocational capacity. (R. 243-244.) They stated that his record reflected the capacity for simple work tasks, relationships, and adjustments commensurate with borderline intellectual functioning. (R. 245.)

James N. Spindler, M.S. On December 10, 2003, Mr. Spindler performed a psychological evaluation of Courtney at the request of a state disability determination agency. (R. 388.) Spindler noted that Courtney was polite and cooperative, had no difficulty focusing on the evaluation process, and appeared to have no problem hearing normal conversation volumes. (R. 390.) He stated that Courtney did not seem to be depressed, demonstrated effective emotional control, reported that he did not have any particular problem with controlling his temper, and stated that he only occasionally felt depressed. (R. 390.) Spindler also noted: "In talking with Vernon, the examiner got the impression that this individual has an adequate level of knowledge for most aspects of daily living. His judgment appears to be adequate for most routine matters." (R. 391.) Courtney reported that he was out of bed each morning by eight o'clock, and that during the day he attended to household chores such as sweeping or washing dishes. (R. 391.) He also reported that he enjoyed fishing with his friends and that he sometimes went camping on the weekends. (R. 392.) In IQ testing, Courtney demonstrated a verbal

IQ of 80, a performance IQ of 84, and a full scale IQ of 80, which Spindler found to be in the low average range of intelligence. (R. 392.) Mr. Spinder concluded that Courtney's mental ability to relate to others, including fellow workers and supervisors, was not significantly impaired from a psychological point of view, that Courtney's mental ability to understand, remember, and follow instructions was not significantly impaired, that his mental ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks was not significantly impaired, that his ability to withstand the stress and pressure associated with day-to-day work activities was not significantly impaired, and that his judgment appeared to be adequate for most routine matters. (R. 393-394.)

Cynthia J. Nickless, Ph.D.  On February 15, 2004, Dr. Nickless, a state agency psychologist, performed a mental residual functional capacity assessment. She found that Courtney's abilities to understand, remember, and carry out detailed instructions were markedly limited, that his ability to complete a normal workday and workweek without interruption was moderately limited, and that his ability to respond appropriately to changes in the work setting was moderately limited. (R. 453-454.) Dr. Nickless stated in conclusion: "The MRFC given is an adoption of the ALJ MRFC dated 2/13/02. The MRFC is being adopted under AR98-4 (Drummond Ruling)." (R. 455.) On April 15, 2004, Dr. Donna E. Winter affirmed Dr. Nickless' assessment. (R. 455.)

**Administrative Law Judge's Findings**.

1. The claimant's insured status for purposes of entitlement to a

period of disability and disability insurance benefits expired on March 31, 2005. There are no insured status requirements for eligibility to SSI under title XVI.

2.  The claimant has not engaged in substantial gainful activity at any time since the alleged onset date of April 13, 2002.

3.  The claimant has these "severe" impairments, which have existed at all times since the alleged onset date of April 13, 2002, except as otherwise indicated: (1) coronary artery disease, status post triple coronary artery bypass grafting involving the left anterior descending, obtuse marginal, and posterior descending coronary arteries on April 20, 2005, (2) chronic obstructive pulmonary disease, (3) history of high blood pressure, (4) status post extensive pneumothorax requiring chest tube intubation and hospitalization from January 25 to February 3, 2004, (5) long history of smoking with cessation of smoking in approximately March 2006, (6) status post interbody fusion and nerve root decompression at C6-7 on January 3, 1997, spondylolisthesis at the C2-3 level, and herniated disc at C 5-6, (7) status post modified radial mastoidectomy and tymnoplasty in 1993 and status post revision of right mastoidectomy converting to radical mastoidectomy on September 22, 1995, (8) bilateral sensorineural hearing loss, documented by audiometry on March 28, 2006, (9) a 9 mm pileal cyst, without any clinical manifestations, (10) episodes on vasovagal syncope, (11) gastroesophageal reflux disease (GERD), (12) history of cellulitis of a seroma of his left leg at the saphenous vein harvesting site in May 2005, and (12) borderline intellectual functioning.

4.  The claimant's impairments do not, alone or in combination, meet or equal the level of severity described in the Listings, nor have they done so at any time since the alleged onset date of April 13, 2002.

5.  The claimant has the following residual functional capacity, which has existed at all times since at least the alleged onset date of April 13, 2002. He has the physical capacities to which the medical expert testified. Mentally, he has the residual functional capacity stated by Mr. Spindler at Exhibit B8F, pages 6 and 7. That is, he has no significant impairment in his ability to: relate to others, including fellow workers and supervisors;

understand, remember, and follow isntructions; maintain the attention, concentration, persistence, and pace to perform simple, repetitive tasks; and withstand the stress and pressure associated with day-to-day work activities.

6. The claimant cannot return to any of his past relevant work, nor has he been able to do so at any time since the alleged onset date of April 13, 2002.

7. The claimant was born on April 14, 1960, and is a "younger individual," within the meaning of 20 CFR 404.1563(b) and 416.963(b).

8. The claimant has a "marginal education," within the meaning of 20 CFR 404.1564(b)(2) and 416.964(b)(2). He graduated from high school in special education classes. He was reading at the second month of the sixth grade level according to a Nelson Reading Test (Exhibit 11F, page 7), and was reading at the 3.0 grade level according to a WRAT-3 (Exhibit B8F, pages 5 and 8).

9. The claimant's previous work experience was semiskilled, but he has no acquired work skills that are transferable to work within his residual functional capacity.

10. Using Vocational Rule 202.18 as a framework for decision-making, the claimant can perform substantial gainful work existing in significant numbers, which has been the case at all times since the alleged onset date of April 13, 2002.

11. The claimant is able to perform 1700 light unskilled jobs in the service delivery area surrounding his home and can perform sedentary jobs. These jobs constitute substantial numbers of jobs, and he is not "disabled," within the meaning of the Social Security Act, nor has he been under such a "disability" at any time since the alleged onset date of April 13, 2002.

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. ..."  Substantial evidence is "'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It means "'more than a scintilla.'" *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments**.  Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because (1) the ALJ's findings with regard to the claimant's mental residual functional capacity are inconsistent and not based on the substantial evidence on file;  (2) the ALJ's mental residual functional capacity finding is not supported by substantial evidence because he did not provide adequate reasons for rejecting Dr. Nickless' opinion;  (3) the ALJ failed to make any affirmative findings of his own regarding the claimant's physical residual functional capacity, but rather deferred entirely to the testifying medical expert; and (4) the ALJ posed improper hypothetical questions to the vocational expert.

<u>Analysis</u>.

Courtney's first two arguments deal with the ALJ's findings as to his mental residual functional capacity. He argues that these findings were inconsistent and not based on the substantial evidence on file. Specifically, he states that the ALJ failed to provide reasons for rejecting, or to even mention, Dr. Nickless' opinion of February 15, 2004. As noted above, Dr. Nickless, a state agency psychologist, performed a mental residual functional capacity assessment of Courtney in 2004.

The Court notes first the provenance under which Dr. Nickless' assessment appears to have arisen. On February 13, 2002, Administrative Law Judge Barbara L. Beran issued a decision on Courtney's 2000 application for disability insurance benefits. (R. 60.) In this decision, she made a residual functional capacity determination which stated in part that Courtney was "mentally limited to work that requires no more than simple tasks, which is consistent with his borderline intellectual functioning and work history." (R. 66.) At the conclusion of her April 15, 2004 mental residual functional capacity assessment, Dr. Nickless stated: "The MRFC given is an adoption of the ALJ MRFC dated 2/13/02. The MRFC is being adopted under AR98-4 (Drummond Ruling)." (R. 455.)

It does not therefore appear that Dr. Nickless' opinion was based upon her review of the medical record *per se*, but that it was instead a restatement of Judge Beran's findings.[3] Neither Courtney nor the Commissioner has, in arguing about

---

[3] Dr. Walter Holbrook's February 21, 2004 physical residual functional capacity assessment contained the same statement that it was an adoption of the

whether the ALJ here adequately addressed Dr. Nickless' opinion, raised the question of whether Judge Beran's mental residual functional capacity determination should have any kind of *res judicata* effect pursuant to *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997). As this issue is not before the Court on appeal, it will not be addressed.

Nevertheless, the purpose for which Dr. Nickless created her opinion colors its application to the present case. Courtney argues that an ALJ may not simply ignore the findings of a state agency psychologist such as Dr. Nickless, and that he was obligated to explain, in his opinion, the weight to which he gave her findings. *See, e.g.,* SSR 96-6p. Despite the Commissioner's contention that the ALJ addressed Dr. Nickless by implication when he stated that he had considered state agency psychologists' opinions, the ALJ's opinion lacks any reference to Dr. Nickless, and does, as Courtney contends, fail to meet his obligation to explain the weight given her opinion. However, Dr. Nickless' opinion is unusual in that it does not actually appear to be based upon the medical record. 20 C.F.R. §404.1527(f)(2)(ii) states that "[w]hen an administrative law judge considers findings of a State agency medical or psychological consultant [...] the administrative law judge will evaluate the findings using relevant factors [...] such as the physician's or psychologist's medical specialty and expertise in our rules, the supporting evidence in the case record, *supporting explanations provided by the*

_____

earlier RFC. (R. 470.)

*physician or psychologist*, and any other factors relevant to the weighing of the opinions." (emphasis added)  The "supporting explanation" provided in her opinion by Dr. Nickless strongly implies that it was simply a restatement of Judge Beren's judicial findings, not an independently created medical opinion.  Although the ALJ here did fail to consider Dr. Nickless' opinion, the opinion is not the kind of medical findings contemplated by the regulations requiring such consideration.  The Court does not therefore find that the ALJ committed reversible error by failing to address Dr. Nickless' assessment, because that assessment does not appear to have constituted an independent medical opinion.

Courtney also argues more generally that the ALJ's findings with regard to his mental residual functional capacity were inconsistent and not based on the substantial evidence on file.  He argues that the ALJ found "borderline intellectual functioning" to be amongst his severe impairments, but nevertheless "seems to give Mr. Courtney no mental residual function capacity limitations."  (Doc. 12 at 15.) The ALJ's conclusions, Courtney argues, are ambiguous, not supported by substantial evidence, and fail to apprise the claimant of the exact findings in his claim.  However, a review of the ALJ's opinion does not substantiate these objections.  Referring and citing to Spindler's December 2003 psychological evaluation, the ALJ explicitly found that Courtney "has the residual functional capacity stated by Mr. Spindler. [...]  That is, he has no significant impairment in his ability to: relate to others, including fellow workers and supervisors; understand, remember, and follow instructions; maintain the attention,

concentration, persistence, and pace to perform simple, repetitive tasks; and withstand the stress and pressure associated with day-to-day work activities ". (R. 31.) Furthermore, the ALJ found that "[f]or the record, the claimant has a mild restriction of activities of daily living; no difficulties in social functioning; and moderate difficulties in maintaining concentration, persistence, and pace." (*Id.*). He further stated at R. 36 the basis for his findings, identifying specific objective evidence in Mr. Spindler's report which supported his conclusions. The ALJ also assessed the reports of Drs. White and Williams at R. 39, concluding that their findings were consistent with his own assessment of Courtney's capacity.

The plaintiff's argument that the ALJ failed to apprise the claimant of his exact findings as to mental capacity is without merit. The ALJ explicitly stated that he agreed with Mr. Spindler, who concluded that Courtney's mental ability to engage in work-related tasks was not significantly impaired. This conclusion is not inconsistent with a finding that Courtney has a severe impairment of borderline intellectual functioning; contrary to Plaintiff's assertion that this "by definition results in some type of work-related limitation", the two are not congruent. The ALJ could reasonably find that it had been objectively demonstrated that Courtney had borderline intellectual functioning, but that psychological evaluation evidence supported a finding that this condition did not present any particular impairments to his ability to work. Furthermore, the ALJ clearly grounded his findings in the medical opinion evidence of Spindler, White, and Williams. The Court therefore finds no grounds to reverse the ALJ's findings as to Courtney's mental residual

functional capacity.

Courtney's third argument is that the ALJ's physical residual functional capacity findings were erroneous and in violation of Social Security regulations. He claims:

> In the instant case, Judge Griesheimer made no affirmative findings of his own regarding the claimant's physical residual functional capacity. In fact, in heading number five of his decision, he states: "he has the physical capacities to which the medical expert testified." Judge Griesheimer then quotes Dr. Snider's testimony over approximately four pages of the decision. By doing this, Judge Griesheimer failed to make any findings of his own regarding Mr. Courtney's physical residual functional capacity; a decision expressly reserved for the Commissioner. While Judge Griesheimer's reliance on the medical expert's opinions is not an issue, his complete deference to the medical expert's testimony in the hearing transcript rises to reversible error.

> 20 C.F.R. § 404.1545(a)(3) states: "[w]e will assess your residual functional capacity based on all of the relevant medical and other evidence." While Judge Griesheimer did discuss most of the medical source opinions on file, his absolute reliance on the testimony of the medical expert indicates that he failed to discharge his duty to consider all the medical evidence on file in assessing Mr. Courtney's residual functional capacity. Regardless of whether Judge Griesheimer chose to rely solely on the testimony of the medical expert or give weight to the other medical opinions on file, he had an affirmative duty to make his own findings regarding the claimant's residual functional capacity. In simply quoting the medical expert's testimony, instead of setting forth a straight forward finding of the claimant's residual functional capacity, Judge Griesheimer failed to discharge this duty. Additionally, Judge Griesheimer's quotation of testimony from the hearing results in an unclear and tangled residual functional capacity finding which fails to properly apprise Mr. Courtney of the findings in his claim. Judge Griesheimer committed reversible error in failing to render a decisive conclusion regarding Mr. Courtney's residual functional capacity.

(Doc. 12 at 17-18; internal citations omitted.)

This claim is likewise without merit. In the first place, the ALJ's opinion

does not state an "unclear and tangled residual functional capacity finding". The ALJ expressly and explicitly adopted the opinion of Dr. Snider as to Courtney's residual physical functional capacity. (R. 31.) He quoted the relevant portions of Dr. Snider's testimony which outlined that capacity: that Courtney could not be at heights or operating a motor vehicle, that Courtney could lift 20 pounds occasionally and 10 pounds frequently, that Courtney needed to work in an air conditioned environment, etc. While the ALJ could have restated Dr. Snider's opinion in his own words, or simplified it to avoid lengthy quotation, there is no question as to what opinion the ALJ adopted as his finding.

The claim that the ALJ had "absolute reliance" or "complete deference" to Dr. Snider's opinion is also unfounded. Except with respect to Dr. Nickless, as addressed above, the ALJ's opinion is replete with findings as to the weight that he gave other medical evidence. *See, e.g.*, Dr. Dixon (R. 35), physicians at Coshocton Memorial and Aultman Hospitals (R. 35-37), Dr. Schrickel (R. 38), Dr. Thompson (R. 38), Dr. Hamza (R. 38-39), etc. The ALJ's conclusions were that "[t]he objective medical evidence supports the physical capacities evaluation offered by the medical expert, which I am accepting." (R. 35.) This does not constitute absolute reliance on the medical expert, regardless of whether the ALJ simply decided to adopt Dr. Snider's entire opinion by reference.

Courtney's fourth argument is closely related, and is that the ALJ's hypothetical questions to the testifying vocational expert were improper because they deferred to the medical expert instead of affirmatively discussing the

claimant's residual functional capacity. Courtney correctly states that if an ALJ bases his opinion that a claimant can perform substantial gainful activity upon the testimony of a vocational expert, the hypothetical questions posed to the expert must reflect precisely the specific exertional and nonexertional limitations of the particular claimant. *Price v. Secretary of Health and Human Servs.*, 61 F.3d 904 (6th Cir. 1995), citing *Varley v. Secretary of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

The record demonstrates that the vocational expert, Dr. Osipow, was present during the entire hearing:

> Q:    Dr. Osipow, you've been present and heard the claimant's testimony and the testimony of the medical expert. Have you had an opportunity to review the evidence in the file?
> A:    Yes, I have.

(R. 1082.)

There is thus no doubt that Dr. Osipow heard the ALJ's request to Dr. Snider for an opinion as to Courtney's residual functional capacity, and Dr. Snider's answer (R. 1071-1078). The ALJ thereupon asked:

> Q:    I'm going to ask you to assume and [sic] individual with the residual functional capacity identified by Dr. Snider. And then the second hypothetical I'll ask you to include some additional limitations. With the limitations identified by Dr. Snider, would such an individual be capable of performing any of the claimant's past work?
> A:    He would not.

(R. 1084.) He later asked:

> Q:    Okay. I'm going to ask a second hypothetical. Limitations identified by Dr. Snider, further considering the limitations with

> hearing, and I would ask you to consider the mental limitations identified from Dr. Spindler, exhibit B8F. [...] Further considering Dr. Spindler's limitations with Dr. Snider's, would such an – would the numbers be different? Are they more limited?
>
> A:    Yeah, the numbers would be different.

(R. 1087-1088.) At the end of the hearing, Courtney's counsel asked a third question:

> Q:    [...] And then one last question. Would there be any affect [sic], and this is somewhat consistent with B13F. [...] B13F talks about moderate limitations being interrupted due to psychologically based symptoms. Dr. Hamsa's says from a physical standpoint, during an eight-hour period, about every three – unpredictable intervals during an eight-hour workday, you're going to have to lie down or rest every three hours for an average of one half our, what affect [sic], if any would that have on any other jobs?
>
> A:    I don't think – there would be no jobs.

(R. 1095.)

As in his opinion, the ALJ incorporated Dr. Snider's opinion by reference in his question to the vocational expert. Courtney's objection, in essence, is that the ALJ asked Dr. Osipow to base his vocational opinion on "the residual functional capacity identified by Dr. Snider", rather than on his own explicit restatement of that residual functional capacity determination. This deference did made it clear that the ALJ found Dr. Snider's testimony persuasive as to Courtney's residual functional capacity, and even that the ALJ planned to rely upon it in stating his findings. But the Court cannot reasonably find a distinction between a situation where the ALJ recited Dr. Snider's capacity opinion to the vocational expert, and one where the ALJ simply told the vocational expert to assume the capacity that he

30

had just heard Dr. Snider state. As described above, Dr. Snider's residual functional capacity opinion was certainly specific enough that it reflected to Dr. Osipow the specific exertional and nonexertional limitations which the ALJ concluded that Courtney suffered. Moreover, it is clear from his testimony that Dr. Osipow understood the specifications upon which he was supposed to base his opinion. (R. 1085-1087.) He was also able to offer further opinions based on more hypothetical restrictions supplied by the ALJ and by Courtney's counsel. (R. 1087-1088, 1095.) The ALJ therefore did not err in asking the vocational expert to hypothetically assume Dr. Snider's residual functional capacity assessment in developing his own opinion, rather than repeating the assessment himself.

Therefore, the Court finds that the decision of the Commissioner was based on substantial evidence. I accordingly **RECOMMEND** that the Commissioner's decision be **SUSTAINED**, and that this matter furthermore be **DISMISSED**.

If any party objects to this Report and Recommendation, that party may, within ten (10) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the party thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgement of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947

31

(6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892

F.3d 15, 16 (2d Cir. 1989).

                                                  s/Mark R. Abel
                                                 United States Magistrate Judge